## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL FINK, | ) | |
| | ) | CASE NO. 1:12CV2065 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE CHRISTOPHER BOYKO |
| | ) | |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff Michael Fink ("Fink") challenges the final decision of the Commissioner of

Social Security, Carolyn W. Colvin ("Commissioner"),[1] denying his claim for a period of

disability ("POD"), disability insurance benefits ("DIB"), and supplemental security income

("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423,

1381 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule

72.2(b).

For the reasons set forth below, it is recommended that the final decision of the

Commissioner be affirmed.

---

[1]      Defendant indicates that Carolyn W. Colvin became the Acting Commissioner of
Social Security on February 14, 2013 and that, pursuant to Fed. R. Civ. P. 25(d), Ms. Colvin
should be substituted for Michael J. Astrue as the defendant in this suit. (Doc. No. 16 at 1.)
Plaintiff does not object.

## I.  Procedural History

On March 14, 2011, Fink filed an application for POD, DIB, and SSI, alleging a disability onset date of November 20, 2009 and claiming he was disabled due to depression, anxiety, suicidal thoughts, diabetes type II, and high blood pressure. (Tr. 347.)  His application was denied both initially and upon reconsideration.

On December 15, 2011, an Administrative Law Judge ("ALJ") held a hearing during which Fink, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 33-70.)  On February 24, 2012, the ALJ found Fink was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 10-24.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1.)

## II.  Evidence

### Personal and Vocational Evidence

Age 42 at the time of his administrative hearing, Fink is a "younger" person under social security regulations.  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  He completed high school and attended approximately two and a half years of college.  (Tr. 45-47.)  He testified to past relevant work as a dishwasher, kitchen helper, delivery person, and fast food manager.  (Tr. 22, 49-57.)

### Medical Evidence

The earliest medical evidence cited by the parties regarding Fink's mental impairments is from late 2009, when Fink was 40 years old.[2]  On December 2, 2009, Fink was hospitalized for

---

[2]     The record also contains medical evidence regarding Fink's physical impairments.  This evidence will be discussed in connection with Fink's first assignment of error.

2

an apparent suicide attempt after overdosing on his blood pressure medication.  After being hospitalized for five days, he was transferred to Burdman Group Behavioral Services ("Burdman"), a "step-down facility," for additional treatment.  Fink was discharged from Burdman on December 11, 2009.  Treatment notes reflected improvement with medication and a Global Assessment of Functioning ("GAF") score of 65.  (Tr. 432-33, 548-551.)

Several days later, Fink was arrested and incarcerated in the Trumbull County Jail for stealing from an employer.  Jail medical staff assessed him with Major Depressive Disorder, moderate, and assigned a GAF of 40.  (Tr. 460.)  While incarcerated, Fink reported hallucinations and suicidal thoughts, and was placed on suicide watch. (Tr. 451-470.)  It appears he was released from the Jail at some point in early 2010.

The record thereafter reflects multiple hospitalizations throughout 2010 for either suicidal ideation or apparent suicide attempts.  The parties cite medical records indicating numerous inpatient stays at both Burdman and psychiatric treatment facility Heartland Behavioral Healthcare ("Heartland").  During this time period, Fink reported depression, anxiety, suicidal ideation, and hallucinations.  His diagnoses included Major Depressive Disorder, Personality Disorder, and Dysthymic Disorder.  His GAF scores ranged between 25 and 70.  (Tr. 466-499, 553-556, 561-566, 771-786, 811-815, 943-955, 994-997, 1004-1011.)  Several treatment notes from this time period question Fink's reliability and suggest he "appear[ed] to be exaggerating the symptoms of depression" because of his problems obtaining housing and lack of motivation to work.  (Tr. 944, 947, 954-55.)

In the Spring of 2010, Fink presented to Valley Counseling Services, Inc. ("Valley") for outpatient evaluation and treatment.  In June 2010, Ronald Yendrek, M.D., conducted a Mental

3

Status Questionnaire.  (Tr. 1031-1033.)  He reported that Fink was depressed and anxious and characterized the severity of Fink's symptoms as moderate.  (Tr. 1031.)  Dr. Yendrek noted minimal deficiencies in social interaction and adaptation, and opined that Fink had a "fair - good" ability to remember, understand and follow directions; maintain attention; and, sustain concentration, persist at tasks, and complete tasks in a timely fashion.  (Tr. 1032.)  Dr. Yendrek noted that "complex pressure/routine tasks may trigger symptoms, increase anxiety/depression." (Tr. 1032.)

Treatment notes from the Fall and Winter of 2010 indicate Fink was working at the Warren Family Mission, cooking meals three times per day for thirty people.  In August and October 2010, he denied depression and anxiety.  (Tr. 1201, 1205.)  In December 2010, he was described as having a euthymic mood (normal) and was "very busy running the kitchen." (Tr. 1340.)  However, at some point in early 2011, Fink was asked to leave the mission for breaking the rules; i.e. spreading rumors and talking to women. (Tr. 1374.)

In March 2011, Fink began treatment with Ruth Martin, M.D., at Neighboring Mental Health Services ("Neighboring").  As part of an initial psychiatric evaluation on March 31, 2011, Dr. Martin described Fink as "markedly ill"and diagnosed him with recurrent depression and PTSD.  (Tr. 1358 -1359.)  She further indicated Fink was learning disabled and assigned him a GAF of 50.  (Tr. 1358.)  Dr. Martin completed a Mental Functional Capacity Assessment, in which she indicated Fink was "markedly limited" in every area of mental functioning.  (Tr. 1361.)  She noted a two year history "of being unable to work [due] to his serious mood disorder (bipolar vs recurrent depression), PTSD, and learning disability," and opined that Fink was "clearly unable to support self at this time thru employment." (Tr. 1362.)

4

In May 2011, Dr. Martin noted Fink had been kicked out of Project Hope for burning someone with a lighter.  (Tr. 1370.)  She continued to describe him as "markedly ill" and maintained his prescriptions for Wellbutrin and Celexa.  (Tr. 1368- 1369.)  In June 2011, Dr. Martin completed an Assessment of Ability to Do Work-Related Activities (Mental) Form, in which she opined that Fink is "markedly limited" in all areas of mental functioning and, further, that the severity of his limitations had existed since November 23, 2009.  (Tr. 1394-1395.)  Dr. Martin indicated Fink would be absent from work more than three times per month due to his impairments or treatment, and that he "clearly cannot support self thru employment." (Tr. 1395.)

Fink continued to see Dr. Martin through November 2011, as well as Neighboring counselors Erin Pawlak, BS, QMHS, CPST, and Eric Main, BS, QMHS, CPST, to address his anxiety and anger management issues.  Treatment notes from this time period contain frequent references to Fink's fascination with fire and history of using fire as retribution against others, including burning others and setting his house and a restaurant on fire. (Tr. 1389, 1469, 1483, 1530, 1536, 1538.)   However, these notes also indicate Fink was showing improvement in reaching his goals of controlling his anger and managing his depression and anxiety. (Tr. 1466, 1469, 1473, 1475, 1479, 1489, 1534.)

On December 19, 2011,[3] Fink's Case Manager from Neighboring, Margaret Soblowski, authored a letter co-signed by Dr. Martin and counselor Eric Main. (Tr. 1565-1566.)  In this letter, Ms. Soblowski indicated that Fink "suffers from anger blackouts-episodes where he will become verbally or physically assaultive" and "has been instructed by both his psychiatrist and

---

[3]     Ms. Sobolewski was available to testify at Fink's December 15, 2011 hearing, however, the ALJ indicated she should submit a written statement instead. (Tr. 64.)  It appears her December 19, 2011 letter was provided to Fink's attorney, who then forwarded it to the ALJ.

therapist at Neighboring not to attend group therapy sessions . . . due to his history of physical and verbal out-lashes." (Tr. 1565.)  She opined that "if Mr. Fink were to return to work, any and all individuals that work in contact with him would be at risk." (Tr. 1565.)  While acknowledging that Fink had been able to volunteer his time and maintain housing in recent months, she attributed these improvements to his intensive therapy and the "high level of interventions he has been receiving through Neighboring." (Tr. 1565.)

### State Agency Physicians

In June 2010, state agency psychologist Karen Terry, Ph.D., completed a Mental Residual Functional Capacity Assessment ("RFC") of Fink.  She opined he would be no more than moderately limited in his mental functioning.  (Tr. 1034-1037.)  She remarked that Fink was "responding positively to medication and that this positive response is expected to continue." (Tr. 1037.)  Finally, Dr. Terry noted Fink is "best suited for a calm, consistent work setting with limited, if any, variability in duties over time and no strict production quotas.  He can relate on a superficial level." (Tr. 1037.)

In April 2011, state agency psychologist Bonnie Katz, Ph.D., conducted a Mental RFC assessment, in which she opined Fink would be no more than moderately limited in his mental functioning but was only able to carry out "simple tasks not requiring him to sustain close consistent attention to detail, in a setting without fast-paced production pressures." (Tr. 86.)  With respect to his social interaction limitations, she noted Fink was able to interact with others on a superficial basis. (Tr. 86.)   Finally, she noted that the medical record to that point did not support the opinions of Dr. Martin. (Tr. 87.)

On August 30, 2011, state agency psychologist Kristen Haskins, Psy.D., completed a

Mental RFC for Fink in which she reached the same conclusions as Dr. Katz.  (Tr. 114-116.)

### Hearing Testimony

At the December 15, 2011 hearing, Fink testified to the following:

- He completed high school and two and one half years of college. (Tr. 45-47.)

- He worked as a shift supervisor at McDonald's from 1994 to 1995, and then left to become a shift supervisor at Wendy's from 1996 to 1998.  He worked at a different McDonald's from 1999 to 2000. He worked at various restaurants as a dishwasher and prep cook.  He was rehired as a shift manager at McDonald's in 2007 and continued in that position until he was fired in 2008 for stealing.  He also worked as a pizza deliveryman. (Tr. 49-57.)

- After his brother passed away in April 2008, his mental health worsened. He began experiencing hallucinations and having suicidal thoughts. He had a tendency to cut himself. (Tr. 38.)

- Prior to his disability onset date of November 2009, he never had any mental health treatment. (Tr. 57.)  He has been taking Wellbutrin and Celexa since approximately 2010, and Latuda was added later. The medication has brought some "stability" but no real improvement. (Tr. 43, 57-58.)  He also takes prescription medication for high blood pressure and diabetes. (Tr. 43-44.)

- For the last couple years, he has been homeless and living in a mission. (Tr. 41.)  At one point, the mission sent him out to help with construction work. (Tr. 59.)  He was removed from construction detail after he intentionally burned someone with a blowtorch on a construction site in May 2010.  (Tr. 59-60.)  While at the mission, he also volunteered as a cook in the facility kitchen for approximately eight months.  (Tr. 41.)  He prepared three meals per day for thirty people, and catered a wedding reception at the facility. (Tr. 60-61.)  He was later asked to leave the mission because he was "breaking rules and fraternizing with the women." (Tr. 61-62.)

- He feels that he cannot work full-time because he has difficulties "dealing with people." (Tr. 38.)  He has had a tendency to injure people when angry.  He burned someone with a blowtorch in May 2010, and burned another person with a lighter in May 2011. (Tr. 39.)

- He "sometimes black[s] out with anger issues if I have to sit there and lose my temper and do stuff and don't remember what I've done until somebody tells me later." (Tr. 39-40.)  His last anger blackout was two months prior to the hearing. (Tr. 40.)

7

- He has a "fascination with fire" that started when he was a child. (Tr. 40, 63.)  He set the kitchen in his house on fire when he was between six and eight years old. (Tr. 40.)  He also set a restaurant on fire and has burned people. (Tr. 40-41, 63.)  He described it as "a growing fascination I'm trying to get under control." (Tr. 41.)

After the VE described Fink's past relevant work as a pizza deliverer, shift manager, and dishwasher/kitchen helper (Tr. 65-66), the ALJ posed the following hypothetical:

> I'd like you to assume you're dealing with an individual who's the same age as the claimant and he's now 42 with the same high school educational background and the same past work experience. Further assume this individual retains the residual function past work at any exertional level but is limited to simple, routine, and repetitive tasks and cannot perform tasks requiring more than superficial interaction with the public or co-workers. Could this individual perform any of the claimant's past relevant jobs?

(Tr. 66.)  The VE testified that such a person could perform past relevant work as a dishwasher, and could also perform other jobs such as a hand packager, machine packager, or power screwdriver operator. (Tr. 66-67.)

The ALJ then added to the hypothetical the limitation that "this individual cannot perform work at a strict, production-rate pace." (Tr. 67.)   The VE indicated that such an individual could not perform any of the previously identified jobs, including dishwasher.  (Tr. 67.)  However, such an individual could perform housekeeping jobs, building cleaning jobs, and hospital cleaning jobs. (Tr. 67-68.)

The ALJ then further added the limitation that "due to a combination of problems, this individual is unable to engage in sustained work activities for a full eight-hour day on a regular and consistent basis." (Tr. 68.)  The VE indicated such an individual would not be able to perform any jobs. (Tr. 68.)

8

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[4]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Fink was insured on his alleged disability onset date, November 20, 2009, and remained insured through the date of the ALJ's decision, February 24, 2012.  (Tr. 10.)  Therefore, in order to be entitled to POD and DIB, Fink must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

---

[4]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

9

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

## IV. Summary of Commissioner's Decision

The ALJ found Fink established a medically determinable, severe impairment, due to personality disorder; however, his impairment did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Fink was found incapable of performing his past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a full range of work at all exertional levels but with certain nonexertional limitations. (Tr. 13.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Fink was not disabled.

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*,

10

25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th

11

Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

Fink claims the ALJ erred by finding his only severe impairment was a personality disorder, and neglecting to consider the medical evidence regarding his physical impairments. (Doc. No. 15 at 14.)  He argues the RFC is improper because it (1) does not contain any restrictions that would accommodate his physical restrictions, and (2) fails to properly account for his mental impairments. (Doc. No. 15 at 15.)  Finally, Fink maintains the ALJ erred by failing to accord proper weight to the opinions of treating physician Martin regarding his mental limitations. (Doc. No. 15 at 18-21.)

### *Physical Impairments*

Fink argues the ALJ erred in finding, at step two of the sequential evaluation process, that his only severe impairment was a personality disorder.  He argues that, although the record reflects treatment for diabetes, hypertension, and asthma, the ALJ failed to mention any of these impairments in the decision.  He further maintains the RFC improperly fails to reflect his physical impairments.

The Commissioner asserts the ALJ did not err because Fink presented no medical source opinion on physical functional limitations.  She further notes that Fink himself identified only mental impairments as the source of his disability, both in his disability applications and hearing

12

testimony.  She argues there is no evidence of physical limitations, citing medical records indicating that (1) Fink's diabetes and hypertension were either benign or under good control, (2) his lungs were consistently found to be clear, and (3) a pulmonary function test found only mild restriction.  Thus, even if the ALJ erred, the Commissioner argues such error was harmless.

At step two of the sequential evaluation process, a claimant must demonstrate that he has at least one "severe" physical or mental impairment to continue with the remaining steps in the disability determination.  20 C.F.R. § 404.1520(a)(4)(ii) and (c); 416.920(a)(4)(ii) and (c); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  A physical or mental impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities.  *Id.*  Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R.  §§ 404.1521(b); 416.921(b).  An impairment will be considered non-severe only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985).

Fink is correct that the ALJ decision does not discuss any medical evidence regarding physical impairments and, further, that the RFC does not include physical functional limitations.  As cited by the parties in their Briefs (Doc. Nos. 15, 16, 18),  the medical evidence regarding Fink's physical impairments is summarized as follows.

In July 2010, Fink presented to Trumbull Memorial Hospital with reports of blood in his vomit.  He was diagnosed with an Upper GI bleed and uncontrolled hypertension.  (Tr. 1173-

1184.)  The following year, in March 2011, he sought emergency room care at Lake Hospital for

nausea and vomiting, and was admitted for four days.  (Tr. 1268- 1316.)  According to his

Discharge Summary, his final diagnoses were (1) acute gastroenteritis, resolved; (2) acute

dehydration, resolved; (3) hypertension, benign; and (4) diabetes mellitus, type 2, controlled.  (Tr.

1268.)  In treatment notes dated June 2, 2011 from the Lake County Free Medical Clinic, Fink's

diabetes mellitus and hypertension are both characterized as being under "good control." (Tr.

1434.)

In July 2011, Fink was admitted to Lake Hospital for two days after reporting dizziness.

(Tr. 1399, 1404.)  The attending physician noted that Fink had "a fairly extensive workup here

including MRIs, cardiology, neurology consultation, echo, and for the most part it was all

negative except for the fact that he occasionally remained orthostatic." (Tr. 1399.)  In a follow-up

appointment the next month, Chetan Patel, M.D., noted Fink was non-compliant with his diabetes

medication and had had a diabetic seizure.  (Tr. 1436.)  Dr. Patel diagnosed essential

hypertension, benign; mixed hyperlipidemia; and, angina pectoris. (Tr. 1436-1437.)  He also

ordered a stress test, which was normal. (Tr. 1436, 1438.)

On September 2, 2011, Fink presented to Lake County Family Practice for a follow-up

appointment.  (Tr. 1511-1512.)  He reported no diabetic symptoms or complications.  (Tr. 1511.)

With regard to his hypertension, Fink denied chest pain, shortness of breath, and dizziness.  (Tr.

1511.)  On examination, his lungs were found to be clear.  (Tr. 1512.)  In a comprehensive

physical exam later that month, Fink reported no diabetic complications.  (Tr. 1506.)  He was

diagnosed with "Type II or unspecified type diabetes mellitus without mention of complication,

not stated as uncontrolled," and "essential hypertension, benign." (Tr. 1508.)

14

Fink returned to Dr. Patel on October 17, 2011 and reported heavy breathing without chest pains after walking for an extended period. (Tr. 1523.) Fink had clear lungs and his heart had a regular rate and rhythm. (Tr. 1523.) Dr. Patel recommended that Fink exercise thirty minutes per week and referred him to Russell Blair, M.D. (Tr. 1523-1524.) After examination, Dr. Blair found Fink's shortness of breath was not cardiac in nature, but that he might have a pulmonary cause for his symptoms. (Tr. 1559.) He ordered a pulmonary function test and sleep study, and prescribed Albuterol as needed. (Tr. 1559.) On November 7, 2011, Dr. Blair advised Fink that his pulmonary function test showed only "mild restriction" with a pulse oxygen level of 98%. (Tr. 1557.) He prescribed Advair, Singulair and Albuterol. (Tr. 1558.)[5]

The parties do not identify any medical opinion evidence indicating that Fink's physical impairments are either "severe" or result in physical functional limitations. The Commissioner does note that two state agency physicians, Elizabeth Das, M.D., and Leon D. Hughes, M.D., opined (in May 2011 and September 2011, respectively) that Fink did not have a severe physical impairment. (Tr. 83, 111-112.)

Regarding the ALJ's failure to discuss the above evidence of physical impairments, Fink acknowledges Sixth Circuit precedent finding that, under certain circumstances, an ALJ's failure

---

[5] After the ALJ rendered the decision, Fink submitted medical evidence to the Appeals Council indicating he was diagnosed with orofacial and tardive dyskinesia. (Tr. 1626-1627.) An EEG showed motion artifact versus possible intermittent generalized sharp waves and indicated that an underlying seizure disorder could not be ruled out. (Tr. 1628.) Fink also submitted evidence that he was diagnosed with severe obstructive sleep apnea and advised to use a BiPAP machine. (Tr. 1568.) As the Appeals Council denied review, this Court's review is limited to the record and evidence before the ALJ. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Walker v. Barnhart*, 258 F.Supp.2d 693, 697 (E.D. Mich 2003). Thus, the Court will not consider this additional medical evidence.

to find an impairment "severe" at step two does not necessarily require reversal.  For example, in

*Maziarz v. Secretary of Health & Human Services*, 837 F.2d 240, 244 (6th Cir. 1987), the ALJ

determined the claimant suffered from several severe cardiac impairments but that his cervical

condition was not severe.  The Sixth Circuit found it "unnecessary to decide" whether the ALJ

erred in failing to find that the claimant's cervical condition constituted a severe impairment at

step two because the ALJ continued with the remaining steps of the sequential evaluation process

and "properly could consider claimant's cervical condition in determining whether [he] retained

sufficient residual functional capacity to allow him to perform substantial gainful activity." *Id.*

Therefore, the court concluded that any ALJ error at step two was harmless.  *Id.  See also Fisk v.

Astrue*, 2007 WL 3325869 at ** 4 (6th Cir. Nov. 9, 2007).

Fink argues, however, that *Maziarz* and its progeny are distinguishable because, here, the

ALJ failed to consider the medical evidence regarding his physical impairments at *any* point in

the decision, including the RFC determination at step four.  He maintains this error cannot be

characterized as harmless because there is no way to determine whether the ALJ was aware of

and properly considered his physical impairments in fashioning the RFC.

While it might have been better practice to discuss the medical evidence regarding Fink's

diabetes, hypertension, and asthma, the Court finds the ALJ's failure to do so does not constitute

reversible error under the circumstances presented.  Although it is uncontested that Fink was

diagnosed with diabetes, hypertension, and asthma, he cites no medical source opinion suggesting

that any of these conditions constitutes a "severe" impairment.  *See Higgs*, 880 F.2d at 863

("[T]he mere diagnosis of [an impairment], of course, says nothing about the severity of the

condition."); *McClanahan v. Comm'r of Soc. Sec.*, 2011 WL 672059 at * 3 (S.D. Ohio Feb. 16,

2011) (same).  Indeed, the only physicians that did submit a formal assessment of the severity of Fink's physical impairments (state agency physicians Das and Hughes) determined his diabetes and hypertension were non-severe.  (Tr. 83, 111-112.)

Moreover, Fink does not direct this Court's attention to any medical opinion evidence indicating he has physical functional limitations as a result of either his diabetes, hypertension, or asthma.  While Fink suggests in his Reply Brief (Doc. No. 18 at 1) that the RFC should have accommodated his physical impairments by restricting him from heights and allowing him to take unscheduled breaks, he failed to present any medical opinion evidence to the ALJ suggesting that such limitations are warranted.  The Court cannot conclude that the ALJ erred in failing to accommodate Fink's physical limitations in the RFC when Fink failed to present any opinion evidence whatsoever that suggests the need for specific physical limitations.  *See Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008) ("Under the first four steps, the claimant has the burden of proof").

In addition, the objective medical evidence cited by the parties regarding Fink's diabetes, hypertension, or asthma does not suggest the need for any particular physical functional limitations.  Although hospital records indicate Fink had "uncontrolled hypertension" in July 2010, subsequent treatment notes consistently reflect that his hypertension stabilized and was either "benign" or under "good control." (Tr. 1268, 1436-1437, 1508.)  With regard to his diabetes, treatment notes similarly indicate that medication controlled his symptoms and that no complications were reported.  (Tr. 1268, 1506, 1511.)  Finally, with regard to Fink's asthma, pulmonary function testing from November 2011 showed only "mild restriction" and a pulse oxygen level of 98%.  (Tr. 1557.)

17

Significantly, the lack of any physical limitations in the RFC is consistent with Fink's self-reporting. During the hearing, Fink was asked generally to identify "why currently you don't feel that you can work full-time." (Tr. 38.) At no point in the hearing did he identify any physical activities that he could not perform. Rather, Fink focused solely on his mental impairments and difficulty "dealing with people." (Tr. 38.) In Function Reports dated May 17, 2010 and April 6, 2011, Fink does not mark any physical activities (such has lifting, walking, standing, sitting, stair climbing, etc.) that his illnesses, injuries, or conditions prevented him from doing. (Tr. 339, 380.) Instead, his responses focus on limitations relating to his mental impairments, such as completing tasks, concentration, following instructions, talking, and getting along with others. *Id.*

In light of the above, the Court finds reversal and remand is not warranted on the basis of the ALJ's failure to discuss the medical evidence relating to Fink's diabetes, hypertension, and asthma. Further, in light of the fact Fink failed to present any medical opinion evidence suggesting that any particular physical limitations were warranted, the Court finds the ALJ did not err in failing to accommodate such conditions in the RFC. Accordingly, Fink's first ground for relief is without merit.

### *Treating Physician Martin*

Fink next argues the ALJ erred in failing to evaluate Dr. Martin's opinions that he is markedly limited in every area of his mental functioning and his impairments would result in three or more work absences per month. (Doc. No. 15 at 20.) He asserts the ALJ "failed to determine whether [these opinions] were entitled to controlling weight, nor did he provide them substantial deference by weighing them according to the factors that ensure a treating physician's opinion is respected and given proper consideration." *Id*. at 20-21.

18

The Commissioner argues that, reviewing the decision as a whole, it is evident that the ALJ thoroughly considered Dr. Martin's opinions regarding Fink's mental impairments.  She asserts the ALJ articulated several specific reasons for according these opinions no weight and, further, that the stated reasons are supported by substantial evidence in the record.

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[6]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the

---

[6]  Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

19

ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

In addition, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the

determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, the ALJ thoroughly discussed the medical records relating to Dr. Martin's treatment of Fink. (Tr. 18-20.) The ALJ specifically noted Dr. Martin's repeated findings that Fink was "markedly ill," "obviously learning disabled," and unable to work. (Tr. 18-19.) The ALJ then weighed Dr. Martin's opinions regarding Fink's limitations, as follows:

> Social Security Ruling 96-5p provides in part that the final responsibility for deciding issues such as whether or not a claimant is disabled is reserved to the Commissioner. However, opinions from any medical source on issues reserved to the Commissioner cannot be ignored. The undersigned must evaluate all evidence in the case record that may have a bearing on the determination or decision of disability. The undersigned gives the opinions of Dr. Martin, especially that the claimant "clearly cannot support himself," no weight, as they fail to acknowledge the claimant's independent daily functioning and his prior psychological treatment records indicating that the claimant purposefully misrepresented his condition in order to obtain housing and other services. Dr. Martin's opinions regarding the claimant's "obvious" learning disability is inconsistent with the evidence showing that he attended college for three years and only stopped attending due to financial constraints. The undersigned finds that Dr. Martin's treatment notes suggest that she is willing to accommodate the claimant's needs and wants such that her complete objectivity is called into question.

(Tr. 21-22.)

As an initial matter, the Court disagrees with Fink's assertion that the ALJ "did not consider Dr. Martin's medical assessments at all." (Doc. No. 15 at 21.) Reviewing the decision as

21

a whole, it is evident the ALJ was aware of Dr. Martin's assessments, including her opinions that

Fink is "markedly ill" and would likely miss three or more work absences per month. Indeed,

these specific opinions are referenced repeatedly and recounted in some detail throughout the

decision. (Tr. 18, 19, 20.) While the decision noted a particular objection to Dr. Martin's opinion

that Fink is unable to work, the ALJ specifically stated that he gave "the *opinions* of Dr. Martin . .

. no weight." (Tr. 21.) (emphasis added). Taken in combination with the ALJ's thorough

recitation of Dr. Martin's opinions earlier in the decision, the Court finds Fink's argument that the

ALJ failed to consider her assessments "at all" to be without merit.

Moreover, the Court finds the ALJ articulated good reasons for according no weight to Dr.

Martin's opinions. The ALJ first found Dr. Martin's opinions were entitled to no weight because

"they fail to acknowledge the claimant's increased independent daily functioning." (Tr. 21.)   The

ALJ discussed the record evidence regarding this issue as follows:

> The undersigned finds that in activities of daily living, the claimant has at
> most a moderate restriction. While he reported in 2010 that he had an
> inability to be alone and that he had difficulty dealing with conflict, he
> demonstrated an ability to sustain a routine of daily living that included
> showering and caring for his personal hygiene even though he lacked
> permanent housing. He also lived successfully in the mission for several
> months and performed daily kitchen duties and cooking in return for a
> stipend. In social functioning, he also describes a moderate limitation. He
> reported continued and increasing conflict with his family members over his
> lack of employment and was evicted from the mission due to conflict with
> another resident. Since that time, however, he has been able to maintain his
> group living arrangements and has a new friend with whom he spends
> significant amounts of time. He has informed his counselors that he has
> defused potential conflicts with others and has learned to express his anger
> appropriately without the use of physical aggression. According to
> counseling notes, the claimant has appeared calmer and more relaxed since
> obtaining permanent housing. With regard to concentration, persistence,
> and pace, the claimant described moderate difficulties, as he claimed that he
> had an inability to work, however, he reported that he was catering wedding
> receptions at the mission and preparing 3 meals and 2 snacks on a daily

basis for the residents. He also maintained a daily schedule of activities and counseling appointments when he complied with his medications.

(Tr. 20-21.)  Fink does not raise any particular objection to these findings.

The ALJ's decision to reject Dr. Martin's opinions on this basis is supported by substantial evidence in the record.  As the ALJ explained, the evidence reflects gradual but consistent improvement in Fink's ability to function with consistent medication, counseling, and access to independent housing.  Indeed, treatment notes from his counselors at Neighboring indicate Fink was showing improvement in reaching his goals of controlling his anger and managing his depression and anxiety.  (Tr. 1466, 1469, 1473, 1475, 1479, 1489, 1534.)  Despite this evidence, however, Dr. Martin continued to assess Fink as "markedly ill" in every area of mental functioning, and agreed as late as December 2011 that "any and all individuals that work in contact with [Fink] would be at risk."  (Tr. 1361, 1394-1395, 1565-1566.)  In light of the evidence indicating Fink's improved abilities in the areas of daily  and social functioning, the Court finds that it was not unreasonable for the ALJ to determine that Dr. Martin's contrary opinions should not be credited.

Moreover, Dr. Martin's assessment of Fink as "markedly ill" is contrary to that of state agency psychologist, Dr. Terry, who found Fink to be no more than moderately limited in his ability to perform work-related activities.  (Tr. 21, 1034-1037.)  The ALJ afforded Dr. Terry's opinion weight to the extent it supported the RFC.  (Tr. 21.)  The opinions of non-examining state agency medical consultants can, under certain circumstances, be given significant weight. *See e.g. Black v. Comm'r of Soc. Sec.,* 2012 WL 4506018 at * 5 (N.D. Ohio Sept. 28, 2012); *Hart v. Astrue*, 2009 WL 2485968 at * 8 (S.D. Ohio Aug. 5, 2009).  This occurs because non-examining sources are viewed "as highly qualified physicians and psychologists who are experts

23

in the evaluation of the medical issues in disability claims under the [Social Security] Act."  SSR 96-6p, 1996 WL 374180.

The ALJ also determined that Dr. Martin's opinions were entitled to no weight because they fail to acknowledge Fink's "prior psychological treatment records indicating that the claimant purposefully misrepresented his condition in order to obtain housing and other services." (Tr. 21.)  As noted *supra*, several treatment notes from Fink's psychiatric hospitalizations in 2010 question Fink's reliability and suggest he "appear[ed] to be exaggerating the symptoms of depression" because of his problems obtaining housing and lack of motivation to work. (Tr. 944, 947, 954-55.)  The ALJ discussed this evidence and noted as follows:

> The evidence suggests that the claimant exaggerated his symptoms
> following his termination from his last employment on criminal charges in
> order to obtain housing and services.  He then demonstrated the ability to
> successfully maintain employment, serving as the kitchen manager for his
> mission for more than 8 months.  The records of claimant's most recent
> treatment suggests [sic] that his psychological condition improved greatly
> once he obtained independent housing and became medication compliant.

(Tr. 22.)

Fink does not challenge the ALJ's credibility determination.  He does argue, however, that it is "irrelevant" whether his hospitalizations were based on exaggerated claims because, even if he falsified his depressive symptoms, this behavior would be consistent with his diagnosis of dependent personality disorder.  (Doc. No. 15 at 16-17.)

The Court finds the ALJ's decision to reject Dr. Martin's opinions on this basis  is supported by substantial evidence in the record.  Medical evidence regarding Fink's hospitalizations in 2010 unequivocally indicate that several treatment providers questioned his reliability and believed he was exaggerating his symptoms.  Moreover, regardless of whether or

24

not any such falsifications were consistent with Fink's dependent personality disorder, the

evidence indicates Fink subsequently developed the ability to work successfully in the mission

and, with counseling and medication, demonstrated continued improvement in his daily and social

functioning.  Because Dr. Martin failed to acknowledge this evidence when assessing Fink's

mental functioning, the ALJ was not unreasonable in determining her opinions should be

accorded no weight.[7]

Based on the above, the Court finds the ALJ articulated good reasons for rejecting Dr.

Martin's opinions and, further, that the ALJ's decision to accord Dr. Martin's opinions no weight

is supported by substantial evidence in the record.  Accordingly, Fink's argument that the ALJ

violated the treating physician rule in rejecting Dr. Martin's opinions is without merit.

### RFC Determination

Lastly, Fink argues the ALJ's decision is not supported by substantial evidence because

the RFC determination fails to reflect that his mental impairments would result in three or more

work absences per month, rendering him unable to perform substantial gainful activity on a

regular and continuing basis.  (Doc. No. 15 at 15- 18.)

The ALJ formulated Fink's RFC as follows: "After careful consideration of the entire

record, the undersigned finds that the claimant has the residual functional capacity to perform a

full range of work at all exertional levels but with the following non-exertional limitations: he is

---

[7]        The ALJ also rejected Dr. Martin's opinions because her opinion that he was
"obviously learning disabled" was "inconsistent with the evidence showing that he attended
college for three years and only stopped attending due to financial constraints." (Tr. 22.)
Because of this inconsistency, and the others noted above, the ALJ determined that Dr. Martin's
"complete objectivity is called into question." (Tr. 22.)  Fink does not raise specific objections
these findings.

limited to simple, routine, repetitive tasks requiring no more than superficial interaction with the public or co-workers, and must not perform jobs with a strict production-rate pace." (Tr. 13.)

The Court rejects Fink's argument that the RFC determination failed to properly account for his mental impairments.  The only physician opinion cited by Fink indicating that his mental impairments would necessitate repeated work absences was that of Dr. Martin.  As set forth above, the ALJ's decision to reject Dr. Martin's opinion was supported by substantial evidence. Moreover, the RFC determination is consistent with other physician opinions, including those of Dr. Yendrek and state agency physicians Terry, Katz, and Haskins. (Tr. 86-87, 114-116, 1031-1033, 1034-1037, 86-87.)

While the Court recognizes there is evidence in the record to support a different conclusion regarding the ultimate question of whether Fink is disabled, the ALJ's decision is not subject to reversal on this basis alone. *See Buxton*, 246 F.3d at 772-73; *Her*, 203 F.3d at 389-90. The ALJ's finding that Fink is not disabled is supported by substantial evidence and is, therefore, within the "zone of choice" where the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545.  Fink's arguments to the contrary are without merit.

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner should be AFFIRMED.


s/ Greg White
United States Magistrate Judge

Date:  June 7, 2013

26

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).